All right, our final case for today is Fischer against, I'll just say MAR, the Hungarian National Railroad. Mr. Pavic. Good afternoon. Your Honor, it's MAV, math. Okay. So we're here appealing the motion to reopen this case based upon a ruling in the Hungarian courts that we believe unreasonably and arbitrarily permitted us from seeking remedies that were supposedly available to us. At the invitation of this court, at the direction of this court, we went to Hungary and submitted a claim. That claim was summarily rejected. We believe that that rejection constituted an unreasonable and arbitrary ruling. We therefore, again at this court's direction, came back with a motion to reopen this case based upon the ruling in the Hungarian court. Let me unravel this for a minute because we have just this very brief statement from the district court and I'll assume for the moment favorably to you that the district court is confused about who is moving, that it wasn't in fact Ms. Kellner, that it was in fact Mr. Fischer. So if I understand what you thought you were doing, you were coming back with a motion to reinstate, as our two eventual opinions had said you could do, and you were essentially trying to make a showing of futility not based on Mr. Fischer's own experience but based on Ms. Kellner's experience because one of the branches that you could go down was futility and the district court thought that she was making her own motion and so was confused and just kind of got off in the wrong track. Is that a railroad case? That's the gist of your One is to look ourselves at whether her experience was enough to show futility because if it wasn't then even if you corrected that mistake you still wouldn't have anywhere to go. Another would be to say to the district court let's get this sorted out, this is an attempt to show futility. I mean there are a lot of other hurdles that this case is going to experience if it gets any further but this one may be one that you can get beyond, I don't know, but maybe you can comment on where you see this going. Yes, I would like to do that, Your Honor. We, for obvious reasons, we would like to get the substance of our motion heard and get past this procedural hurdle of whether or not we had We do believe that the gist of this Well, Mr. Fisher's been the plaintiff all along. He's always been, well he has been the plaintiff at least through the Fisher, the second case for this court. This court was originally filed on behalf of the Hungarian Holocaust victims. The court made the point that we needed to have an individual plaintiff. Paul Fisher took up that role and it's been Paul Fisher who's been the plaintiff, clearly the plaintiff, when the motion was sent down the second time it was sent down Fisher versus Mag. The motion was entitled motion to reopen the case, motion to reinstate by the plaintiff, Paul Fisher. Now that motion was based on the experience of Kellner. This court, for the first time, this court imposed a gloss on the statute that required, admitting that we have met the requirements of the statute itself, imposed an additional requirement that we had to meet, a gloss on the statute. But that's the law of the case, the comedy gloss on the statute that we would like to see exhaustion of domestic remedies. That's a very common rule in international law and so one issue, even if again we go with you and we say this is really Fisher's case and so on, is whether in the absence of Mr. Fisher himself trying to exhaust, you've done what we asked you to do because one of the things the Hungarian courts wanted was some effort to look through the archives, some effort to become specific about the individual's experience and it's difficult, I take your point on that, but it may not be impossible. The Hungarian courts said that anyway. It did and we believe, and we can get into substance of that, whether that constituted an unreasonable and apart from that, this court did not direct any particular, again, in fact I believe, Your Honor, that this is the first court to have required this type of gloss on the statute. The restatement, for example, of fourth of foreign law specifically has addressed the issue here and has said that this court was incorrect in putting the gloss on it. But putting that aside, Your Honor, it's the law of the case. But the point is, the point is, the court directed us, and this is the first court to have so directed, to the plaintiffs. If the plaintiffs can show, the plaintiffs can show that their attempt to seek a remedy has been unreasonably and arbitrarily blocked, they can return. The courts of discourse will be open. We did not get any specific direction that it should be any given one of the class members or... But it's not a certified class. You don't have a class yet. That's correct, but it was clear that there were a number of whether it was listed in the original complaint or whether it's listed in the complaint before the Hungarian court, it was clear that we had a number of victims. And this court did not, when it said plaintiffs, did not specifically instruct us that it had to be Paul Fisher. In fact, anyone whose claim was similarly situated, the claim could be brought. So we then had to make the decision, who is best suited to bring this claim? When you made that decision, was there anything that prevented Mr. Fisher from filing a new civil action as opposed to the motion to reinstate? Because what it seems like when you look at Judge Duryagan's order, as Chief Judge Wood is pointing out, he thought, I mean just by reading it, that it's plaintiff Ms. Kelner. Did either side, after the order was entered, point out to Judge Duryagan, hold on, Ms. Kelner is not a plaintiff, not the plaintiff. She's a putative class member. Correct. No. Did we move for reconsideration? No. Or point out that there's a mistake here because... And I'll tell you why we didn't. I can't speak for the other side. Okay, and then why not Mr. Fisher, anything from filing a civil action? Or Ms. Kelner for that matter. Or Ms. Kelner, either one. I mean she may not want to. Are you saying that Mr. Fisher should file here in the district court and Ms. Kelner... It's not so much a should as much as he could have, and we wouldn't have this whole kind of rubber band knot of who's the plaintiff below. He did file here, clearly, it was Mr. Fisher's motion. Now, could we have filed a motion for reconsideration? We could have, but we did not because, as we've cited in our supplemental memorandum, if you look at the gist of this, if you look at the core of what we were saying, we were presenting this Telenews experience, and it was clear to us that the court, it seemed clear to us, that the court was rejecting that. So whether we colored that as a motion by Fisher... I don't know, how are you so sure about that? Because Judge Juryagan said Ms. Kelner is not the named party, and therefore there's no standing. So I don't think, I don't read it as he being focused, Judge Juryagan being focused on whether that the exhaustion framework set out in this court's 2015 opinion by Judge Hamilton, satisfied or not satisfied. I just think he's got the wrong party here. Your Honor, it's a cryptic order, and we can all That's not too cryptic. He didn't say anything about sufficiency of exhaustion. The order is cryptic, our position on it is also very simple. You've identified the wrong party here, but our position on that also is, rather than that it seemed to us clear that he was rejecting the Kelner filing in Hungary as being a filing that was, and the ruling as being unreasonable and arbitrary, and we wanted to get to the heart of that matter. We wanted to get back to this court as quickly as we could for obvious reasons. But see, maybe you rushed too far, because I want to go to the topic of our supplemental memoranda at this point, because I think there's a serious question that appellate jurisdiction is lacking. It looks like an interlocutory order to me. I don't see why. There was no time limit on this motion to reinstate whatever it was, you or something else, and if we don't have appellate jurisdiction, that means the case is still alive in the district court, and you can go fix the parties, you can, you know, make a motion to add a new plaintiff, forget about class actions, there's rule 20. You can just ask for an amended complaint. There are two fundamental problems with going back at this point, as you know. It would lead to a new judge now, it would not be Judge Zerhagin. Well, maybe that's, some people asked for that. And secondly, sadly, Ms. Kellner passed away. Say that again, Ms. Kellner. Ms. Kellner has passed away. She's passed away. So, but it'll clearly be Mr. Fisher's case then, if he's still interested in pursuing this, and so the confusion goes away. He can make his argument about the factual basis of somebody else's effort to exhaust. The district court can make a decision about whether that's, in this instance, or ever permissible. I mean, maybe yes, maybe no. I'm not going to prejudge that one, but it, the question is, in order to have appellate jurisdiction, you have to have a final judgment, or you have to have some reason for an interlocutory order, and it's not clear to me that we have finality. Well, Your Honor, as we've responded in our supplemental memorandum, we do believe we have finality. If you view this as we do, that the trial court, in looking at the core of what we were presenting, the core of what this motion was, the core of it, was the Kellner file. All he says is Kellner's the wrong person. No class was certified. Kellner was not and is not a named party. Anyway, well, if you want to It's also odd because you have, if Judge Duryagan, if we assume, if we just take what he said in the case of his order, that Kellner is the movant in front of me. Kellner's not the appellant in this court, either. Right? So, Kellner's the recipient of Judge Duryagan's order, but Fisher is clearly the party that filed the appeal here. And Fisher, really, Your Honor, is the plaintiff. That's odd, though. That's why it's a procedural mess. We can all agree that it's odd, but I do believe that under the circumstances of this case. More of a procedural snarl. Yes. That's correct. And, Your Honors, we're trying to get past this, I implore you, if we can, to get past this procedural snarl, to get to the substance of the matter that the Seventh Circuit has presented us with. Was this filing, in Hungary, in the ruling of the Hungarian court, did that constitute an unreasonable and arbitrary blocking of our attempt to seek a remedy? That's what we would like to get to at the trial court, Your Honor. Right. Right. I hear it. I mean, these are really serious claims alleged in the complaint. Isn't your faster path, the one that I think Chief Judge Wood is suggesting, that you just undo the snarl and get back in the district court on the substance of the sufficiency of the exhaustion? Your Honors, if you would give us an order saying that the trial court was incorrect, go back down and do exactly, Your Honor, what you just said, we would obviously accept that, because that's the shortest route. Time is of the essence. We need to get to the substance of whether or not we met the substantive requirement of this court by going to Hungary, being confronted with that order, and whether or not that constitutes a sufficient basis for us to come back. Because, Your Honors, we have no reason to believe, and the defendant has never suggested otherwise, that this order would be different for any one of our other 120 plaintiffs. Well, we're getting ahead of ourselves now. I'm going to suggest you save just a minute. You don't have much time for rebuttal. Thank you. And we'll hear from Mr. Silbert. Good afternoon. May it please the court and counsel. I'm going to start with jurisdiction, and then I'd like to talk about some of the procedural snarl issues. We always like jurisdiction, Mr. Silbert, so you're welcome to start there. Good. The district order is not final and appealable, because it does not clearly bar the revival of the plaintiff's claims. And I think the simplest way to see that is to ask, what would happen if you affirmed that order on the merits? Would the case be over, leaving nothing for the district court to do but execute the order as in a final judgment? Or would there be unresolved issues that could still be decided by the district court? I think the conversation you were just having about the procedural snarl, all of that points to unresolved questions that could still be decided by the district court. And if there are questions that we don't know the answer to now, that the district court could decide later on that would then come back to you in a subsequent appeal, you don't have a final judgment. So we'd be at Fisher 4 by then. We'll be, yes. Well, the first one was Abelez. Abelez, I know. They're all linked. Fourth round of this appeal. There were a couple of Abelezes, actually, so. Right. So you don't have a final order. I will briefly address the grounds for finality that the plaintiffs discussed, and then let's turn to some of these questions about the appropriate procedure and what plaintiffs should do next if they want to try to continue. As I read the plaintiff supplemental memorandum, what they essentially argued is, well, the judge's order is final as to discrete issues. It was final, the plaintiff said, on page 2 as to whether it's supposed to be Mr. Fisher or another one of the named plaintiffs who exhausts as opposed to a putative class member. They also said it was final as to whether Ms. Kellner had standing. And the problem with that argument is that finality is not measured by issues. It's measured by cases. Every order by a district court resolves some issue, generally, finally, with respect to that issue. What every order doesn't resolve is the entire case. And as this court said just a few months ago in Gleason, you know it's a final order because it's the district court's last word as a whole on the entire case. I think it's pretty clear that in this case we don't have the district court's last word. On what? On the entire case. Right. But don't we have the district court's last word as to whether the movement on the 60B motion was a proper movement? We do. So that's what's being appealed, isn't it? It is. The appeal is from the denial of the 60B, and the 60B was filed by a putative class member. Yeah. But that doesn't necessarily fit Rule 54, though, because it's not all claims of all parties. Right. If we think there are multiple parties. Yeah, that's right. I'm sorry to interrupt, Judge. No, no, I'm sorry. But you're right. And Ms. Kellner, in fact, was not a party, and there was no 54B judgment. And you're right, Judge Scudder, that there may be a final ruling as to that issue. But, again, an appeal does not come up to you. You don't appeal issue by issue. The litigants appeal from a judgment, and the appeal from the final judgment brings up all orders that were previously entered, which, yes, of course, they resolve issues. And when an order comes down, that issue is determined, and it creates winners or losers. But the loser doesn't get to come up and visit you every time a discrete issue is resolved. And that's what we have here. We have an order on an issue, not an order on the entire case. So this is not an appealable order at this time. So I think what the court has to do is dismiss the appeal for wanton jurisdiction. Now, let's talk about what plaintiffs should have done and what they could do. You asked a question, Judge Wood, could Ms. Kellner have filed her own lawsuit? She certainly could have. I'm sorry to hear that she passed away. We didn't realize that. Well, I mean, when I read all of this, you know, it did seem to me strange that there wasn't, I mean, there are a lot of things you could do. You have a putative class member in a class that hasn't been certified, but it doesn't mean that Rule 20 doesn't exist. You could always try to file an amended complaint with a new named person. It also suggests that for the cost of a filing fee, you know, another member of the class could have an independent lawsuit, and this a person who has taken significant steps, I'll say, to exhaust in Hungary. It was by no means a token effort. Whether it's enough, you know, somebody will decide at some future time. So there's that. There's just saying to the district judge, there's been a misunderstanding here. Here's our motion. It's Fisher. It's not Kellner. District judges fix things all the time when something's caught their attention. So, yeah, there's a lot that could happen. That's right, Judge. I think of the options that you just described, the cleanest path to the plaintiffs would have been, after they made the choice to have Ms. Kellner attempt to exhaust in Hungary, the cleanest path for the plaintiffs would have been simply to have Ms. Kellner file a complaint as the named plaintiff. Now, are these cases maybe, I'm going to borrow some of your expertise here, do they continue to be pursued in the name of the estate of somebody or other, or do they terminate with the person's death? This is essentially, it's under the expropriation exception to the Foreign Sovereign Immunities Act, as I recall. Yeah, I think that would depend on the substantive law that the plaintiffs are asserting as a basis for recovery. I don't know. My guess is plaintiffs would at least assert that they could recover on behalf of the estate, so they could have filed a claim. I don't know whether they would want to or ultimately could bring a claim on behalf of Ms. Kellner's estate, if that's where you're going. I'm just trying to think broadly here. But I do think, and I get it, it is a snarl. I think it's a snarl of plaintiffs' own making. I think what plaintiffs should have done at the outset, if after this court decided, maybe when this court decided Avala's back in 2012, but certainly after Fisher, the last Fisher appeal, what they should have done is had at least one or maybe all of the named plaintiffs attempt to exhaust claims in Hungary, and here's why it matters that it's the actual plaintiffs. If you go back to the complaint that commits this action, there are 21 named plaintiffs. They're seeking all kinds of different recoveries. Some of them are claiming damages for personal possessions like Ms. Kellner claimed in Hungary. Right, she had the suitcase with all sorts of family treasures in it, right? That's right. But there are many other kinds of damages that they're asserting too. They're claiming they're trying to recover for pension funds. They're trying to recover for leaseholds. They're trying to recover severance pay for MAV employees. They say that at least one named plaintiff says that they had goods that were stored in a warehouse that MAV owned or controlled, and those goods were never recovered. They have many different theories of loss and of recovery. So cutting to the chase, I think where you're going is that the Hungarian law may treat these different theories differently. There may be differences in Hungarian law. There may be differences with respect to the evidence. There may be differences with respect to the availability of witnesses, right? And I'm going to mention that Hungarian law has not been doing so well recently either. I will let that statement go without comment. I don't know if you agree with me, but I just read the newspapers, right? I understand your point there. So one of the concerns on the other side, if that's right, is going to be that it's going to send the claims into kind of this endless loop that they're concerned about. In other words, based upon what you just said, you're going to say exhaustion is unique as to Kellner. It's unique as to Fisher. It's unique as to others as well. And we just learned that Ms. Kellner, unfortunately, has passed. And so if there was an attempt to bring the new claim, it's not going to be by Ms. Kellner, presumably, right? It's going to be by Mr. Fisher. And your response to that, I think, is going to be, well, Mr. Fisher, to our knowledge, hasn't attempted to exhaust in Hungary. Correct. I think that it's the plaintiffs in the case. As you said, Judge Wood, there is no certified class here. Even if the case went forward, there may never be a certified class. And if there were a certified class, it might not include all of the putative class members who plaintiffs identify in the complaint. So the people who have to act on behalf of the plaintiffs now are the plaintiffs themselves. So they have to go to exhaust. Now, if a plaintiff goes to exhaust who, let's say, it's Mr. Fisher. Remember, they have 21 named plaintiffs in the complaint. But let's say it's just Mr. Fisher. He says, I lost possessions, but I'm not making any claims about leaseholds or severance pay or pensions or the other theories of damages that the plaintiffs have. Let's say whatever happens happens in Hungary. He comes back here. He says, I tried in Hungary. I was foiled arbitrarily or unreasonably. Let's say the district court agrees with him. Let's say you agree. So now, under the ruling of the last Fisher appeal, Mr. Fisher can go forward on his claims here. He could then apply to be a class representative for class members who have similar claims. What he couldn't do is then try to be a class representative on behalf of a class of pension seekers or people who are trying to get severance pay because that claim has not been exhausted. At least that would be your position. I'll go that far. I think it would help everyone if we just had some clarity. Because we're just trying to lay out for you how we think this is actually sensibly supposed to work. Quite frankly, we don't think plaintiffs have done it the way they were supposed to do it. And while we recognize they're in a bit of a procedural jam, again, it's one that they created. But look, as you said, Judge Scudder, these are very serious claims. And the exhaustion issue is serious. And it's a serious question of how a sovereign entity is going to deal with these kinds of claims against it 70 some years later where there's very little evidence and so on. But look, if the plaintiffs want to test that question, what they have to do, these plaintiffs, the parties who brought the case or whoever's going to bring the next one, they have to go to Hungary. They have to assert their claims. They have to try to win, not try to lose. That means they have to actually take advantage of whatever. I don't think there's any sense that Ms. Kellner was trying to lose and just throw the case. I don't know. What I do know is that there were options available to the plaintiffs to try to uncover evidence that they did not utilize. So all I mean to say, and I'm certainly not casting aspersions on Ms. Kellner, but I do think that if what plaintiffs want to do is hold out their efforts in Hungary as showing exhaustion, they have to take advantage of whatever procedural opportunities. Even including getting sanctioned by a Hungarian appellate court for taking a frivolous appeal? No, Your Honor. They don't have to get sanctioned, but I don't know. I mean, they said there was a possibility that they were advised by their lawyer that if they appealed, not only fee shifting I get. I certainly have seen plenty of international litigation that happens, but sanctions are another matter. Well, what I had in mind, Your Honor, is attempts to obtain evidence. Okay, so they did not make any effort to collect records. They did not make any effort to ask the judge to collect evidence. And you think there would have been records in Hungary of somebody's suitcase that got stolen in 1944 on the train? Unlikely that you would find records of this suitcase, Your Honor. But there may be records of participation by MAV employees taking people's property at the times in question. There may be any kind of evidence that could support their claim. There may be witnesses, other people who were in similar situations. Her complaint in Hungary lists dozens of people who she says were in similar situations. None of them were called. There could be expert witnesses. There could be historians. There could be whatever efforts they could make to try to prove their case so that anything that comes back to you shows essentially a complete effort in the Hungarian court system so that you can judge how does the Hungarian court address these issues. Understanding all of the difficulties with the passage of time, with the very difficult circumstances in which these events occurred. They're a court system just like you are. They have to wrestle with problems just like you do. And they have to come up with solutions. And before a court of the United States says, hey, Hungary, you flunked the test. You arbitrarily or unreasonably barred a remedy, there ought to be some proceeding in Hungary at which all of the opportunities that are made available to the plaintiff to try to prove their case are used. The paths are followed. They're explored. You have a complete record. And then you can say, look, whatever they did, win, lose, or draw for the plaintiffs, it was not unreasonable or arbitrary. Or you can say, alternatively, it was unreasonable. And therefore, under the rule of the last Fisher appeal, the case would go forward. Okay. Thank you. All right. Thank you very much. Mr. Pavich, you have the last word. Your Honors, there were good reasons that we selected Ms. Kellner. We had to find someone who had a good memory of the events, who was old enough at the time to have recalled them. She was 18 years old. Paul Fisher was 7. Someone who could afford bringing the case. It was not easy, Your Honors, to find someone who was capable of bringing this case in Hungary. We were given no direction by this court that it had to be anyone in particular. So we tried to bring the person who could bring the strongest and simplest, most straightforward case. Not a case of leaseholding. Not a case of rent, rent properties. But a case of simple taking of property on the train, while she was on the train, and as she was getting off the train. We were far from what counsel was suggesting, that we were perhaps going into the tank. We selected the best person who could bring the strongest claim, in our opinion, to test whether or not we could get a fair shake in Hungary. She was 18 years old. She had a clear memory of the events. An unrebutted affidavit of what had happened. And as far as the invitation to go to the Hungarian Railroad Archives, I don't think it takes much imagination to say how long that would have taken us. And for what? I mean, do we really believe that there would have been a receipt given to Ms. Kellner for the taking of her property, and they would have kept a duplicate receipt of what they took from her, and kept that in the Hungarian Railroad Archives? We felt that would be a fool's errand. That would take us an indeterminate amount of time to go through the procedures that we would be confronted with. What we were confronted with was the assertion of the statute of limitations, contrary to what was represented at this court, and at the last time we were here, that the statute of limitations would not be invoked. Isn't this something the court raised on its own, the Hungarian court raised on its own? Or did Mav raise it? Not clear. Not clear on the record. But we were clearly confronted with something that had this court known, I put it to you, had this court known that we would be confronted with a statute of limitations and with a procedural rule, a procedural rule that would not accept the credible unrebutted testimony of an eyewitness. The statute of limitations argument, though, or was it that the law just didn't allow a claim from this time period? The law created a new claim, I thought, in 1977 or something. I don't think it was that there might be a valid claim, but it was brought untimely. I understood it different than that. No, I think what it was, Your Honor, is that the law that the court was citing in the Hungarian court was that no claims could be brought for any actions that occurred prior to 1978. Right. So there was no cause of action. Right. So we were a fact barred. And there's no reason to believe that any one of our other plaintiffs is going to find a different result. The second ruling was the procedural ruling. And with regard to the procedural ruling, I want to, again, perhaps just cite to the court's, this court's specific admonition that if we have a procedural bar that's unreasonable or arbitrary, that would be grounds for coming back. So the second prong of the Hungarian court decision was procedural. Okay. It was procedural. Thank you very much, Mr. Fisher. So thanks to both counsel. We will take the case under advisement.